**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| RONEN HALPERN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:09CV00474 |
| | ) | |
| WAKE FOREST UNIVERSITY HEALTH | ) | |
| SCIENCES, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This matter comes before the Court for a recommended ruling on Defendant's Motion for Summary Judgment (Docket Entry 19), pursuant to this Court's Amended Standing Order 30 (<u>see</u> Docket Entries dated July 2, 2009, and July 15, 2010).  For the reasons that follow, the Court should grant Defendant's instant motion.

<u>BACKGROUND</u>

According to the Complaint filed in this case:

> Plaintiff Ron Halpern [is] a former medical student at the Wake Forest University School of Medicine, alleging that he was terminated only months before completing his final year and receiving his M.D. degree because of Defendants [sic] failure to make reasonable accommodations required by the American's [sic] with Disabilities Act for Plaintiffs [sic] diagnosed disability of Attention Deficit Hyperactivity Disorder ("ADHD") and Anxiety Disorder Not Otherwise Specified ["ADNOS"].

(Docket Entry 1 at 1.)  Through this action, Plaintiff seeks "injunctive relief [in the form of an order] requiring Defendant[] to reinstate him to his former status in the medical school

curriculum immediately prior to his dismissal, and to make the appropriate accommodations for both the academic and behavioral aspects of the program," as well as "his actual damages" and "costs . . ., including reasonable attorney fees." (Id. at 7.)

Under the heading "Facts," the Complaint alleges that Plaintiff's "disabilities – and the side effects of the medications he is taking for those disabilities – substantially limit his ability to learn, concentrate, think, communicate and work with others in a socially appropriate manner, especially under stress." (Id. at 3.) The Complaint acknowledges that Defendant granted Plaintiff's requests (first made on December 14, 2007)[1] for accommodations in the administration of medical school examinations based on Plaintiff's reported ADHD. (Id.) However, the Complaint asserts that, despite the fact that, "at least five" times after December 14, 2007, Plaintiff "made known to Defendant the behavioral aspects of his ADHD, some if not most of which were a result of the side effects of the prescription medication Plaintiff was taking for his ADHD . . ., [Defendant did] not [accommodate] the behavioral aspects of Plaintiffs [sic] ADHD." (Id.)[2]

The Facts section continues: "Rather than make appropriate accommodations for social deficits resulting from Plaintiff's ADHD

[1] It alleges Plaintiff enrolled on July 26, 2004. (Docket Entry 1 at 2.)

[2] Specifically, it alleges that, "[o]n at least three separate occasions prior to his dismissal, Plaintiff met with [medical school administrators] and discussed the side effects of the ADHD medications he was taking, and how they accounted for what [D]efendant perceived as 'unprofessional conduct, including inappropriate and argumentative behavior' . . . ." (Docket Entry 1 at 3-4.)

medications, Defendant initiated disciplinary proceedings with the Student Promotions and Progress Committee (SPPC) . . . [pursuant to which] the SPPC voted to recommend Plaintiff's dismissal based upon instances of inappropriate and argumentative behavior, tardiness and failure to submit thank you letters to scholarship donors." (<u>Id.</u> at 4 (internal quotation marks omitted).) It further alleges that "Plaintiff appealed the SPPC decision . . . [in a manner that] outlined his disabilities and described the immediate and concrete actions taken to remediate the effects of his disability." (<u>Id.</u>) According to the Complaint, as part of that appeal, a physician treating Plaintiff "wrote Defendant and stated that, in her medical opinion, Plaintiff's behavioral issues stem from ADHD, ADNOS and stress related to growing up in Israel, surviving trauma, family dynamics and family modeling, and on-going exposure to first-hand accounts of the Holocaust." (<u>Id.</u>) Said letter allegedly also described Plaintiff's treatment plan (which involved "a panel of three professionals") and included the physician's "stat[ement] that, in her professional opinion, Plaintiff 'is capable of change and has begun the process.'" (<u>Id.</u> at 4-5.) The Facts section concludes by alleging that Defendant denied Plaintiff's appeals and that, "[o]n or about 29 January 2009[,] Plaintiff was dismissed from [the medical school] on the basis of behavior clinically diagnosed as caused by Plaintiff's disabilities." (<u>Id.</u> at 5.)

The Complaint states: "This action is brought under Title II

of the Americans with Disabilities Act, 42 U.S.C.S. § 12132, as
well as § 504 of the Rehabilitation Act of 1973, 29 U.S.C.S.
§ 794(a)." (Id. at 2.) "Count I" sets out Plaintiff's
Rehabilitation Act claim by alleging that Defendant (a recipient of
"Federal funds") "denied [Plaintiff] services on the basis of his
disability" and "intentionally failed to make accommodations
required under Section 504, in that they were aware of Plaintiff's
disabilities, but failed to assure accommodation to the educational
program to meet his needs, which resulted in Plaintiff's
dismissal." (Id. at 5-6.) "Count II," with the heading "Title II
of the Americans with Disabilities Act, 42 U.S.C.S. § 12132,"
alleges that Defendant "discriminated against Plaintiff solely on
the basis of Plaintiff's disabilities in violation of 42 U.S.C.
§12101, and the Federal regulations promulgated pursuant to the Act
at 28 C.F.R. Part 35 et seq." (Id. at 6.)

Plaintiff thereafter amended the Complaint (to properly name
Defendant) (Docket Entry 6) and Defendant answered (Docket Entry
8). Plaintiff later made another amendment to add a jury demand.
(Docket Entry 13.) After the close of discovery, Defendant filed
the instant summary judgment motion with supporting materials.
(Docket Entries 19-28.) According to Defendant, Plaintiff "cannot
demonstrate that he was a qualified individual with a disability,
that the School of Medicine dismissed him solely due to his
disability, or that the School of Medicine denied him reasonable

accommodations that would have rendered him qualified to continue in medical school." (Docket Entry 28 at 2.) Defendant also argues that Plaintiff's claim under Title II of the Americans with Disabilities Act ("the ADA") "fails because Defendant is not a public entity subject to suit under Title II." (Id.)[3] Plaintiff has responded (Docket Entries 36-47) and Defendant has filed a reply (Docket Entries 54, 55).

FACTS[4]

While undertaking undergraduate studies at Emory University, Plaintiff experienced difficulty studying; as a result, he underwent an evaluation which resulted in an ADHD diagnosis. (Halpern Dep. at 17-18.) Based on this diagnosis, Plaintiff started taking medication. (Id.) He also sought and received

---

[3] Shortly after Defendant made said filing, Plaintiff sought leave to amend his Complaint again. (Docket Entry 31.) In said motion, Plaintiff proposed to add three new "Counts" for "Breach of Contract," "Breach of the Covenant of Good Faith and Fair Dealing," and "Title III of the Americans with Disabilities Act," respectively. (Id. at 1-5.) Defendant opposed said motion based, among other things, on the absence of good cause under Federal Rule of Civil Procedure 16(b) to warrant amendment outside the time limit prescribed by the Court's scheduling order. (Docket Entry 32.) The Court denied Plaintiff's proposed third amendment on that ground and Plaintiff has objected. (Docket Entries 55, 56.)

[4] As discussed in the next section, the Court derives the facts by viewing the evidence in the light most favorable to Plaintiff without making credibility determinations. With their summary judgment filings, the parties have submitted affidavits and deposition excerpts, as well as exhibits cited therein. The Court has drawn the majority of the facts directly from Plaintiff's deposition (cited as "Halpern Dep."), which appears at Docket Entries 27-1 through 27-4. Other evidentiary materials cited herein include: 1) the affidavit of William Applegate, M.D. (cited as "Applegate Aff."), which appears at Docket Entry 22; 2) the deposition of Robert Finch, M.D. (cited as "Finch Dep."), which appears at Docket Entry 27-6; 3) the affidavit of Joseph Ernest, M.D. (cited as "Ernest Aff."), which appears at Docket Entry 21; 4) the deposition of Dr. Ernest (cited as "Ernest Dep."), which appears at Docket Entry 39-2; 5) the affidavit of Burton Reifler, M.D. (cited as "Reifler Aff."), which appears at Docket Entries 23 through 26; and 6) the deposition of Gary Carr, M.D. (cited as "Carr Dep."), which appears at Docket Entry 38-2. Page citations to exhibits refer to bates-stamped numbers on said documents.

accommodations in the form of audio-recorded textbooks and more time and/or a separate room to take tests. (Id. at 17-22.) Plaintiff graduated from Emory in four years with a Bachelor of Science in Biology. (Id. at 11.)

In July 2004, Plaintiff enrolled in Defendant's Doctor of Medicine program. (Id. at 48.) "[This] program is generally designed as a four-year program, with the first two years primarily focused on the acquisition of core medical or science knowledge." (Applegate Aff. at ¶ 13.) After that course-work, "students must successfully pass a [national] [e]xamination . . . [before] continu[ing] into the third year of medical school which consists of clinical rotations . . . . At the end of these clinical rotations, students then must successfully pass [another national examination] . . . . The fourth year of medical school . . . involves additional blocks of clinical skills education." (Id.)

Plaintiff did not disclose his ADHD diagnosis to Defendant's medical school personnel before or during his first two years in the program. (Halpern Dep. at 22, 48.) He passed all of the requirements of the first two years of the program (achieving a position roughly in the middle of his class) without any accommodations for any disability. (Id. at 50-51, 56.) Plaintiff, however, "start[ed] to have a great deal of trouble with [his] medication towards the end of [his] second year [of medical school], . . . which was causing insomnia." (Id. at 56.)

Beginning in February 2006, Plaintiff was "treated for that insomnia with a drug called Ambien . . . while [he] was on the stimulant called Aderol [sic]." (<u>Id.</u>; Finch Dep. at 47-49 and Ex. 1, p. 1439.) This combination of circumstances was "very devastating to . . . both [his] studying and [his] functioning as a whole." (Halpern Dep. at 56.) By March 22, 2006, Plaintiff stopped taking Ambien and "a lot of [the problems] went away . . ., but clearly not everything. [He was] still having . . . a very hard time controlling the Aderol [sic]. The side effects were really bad . . . in terms of concentrating, insomnia, . . . [and] symptoms like hot flashes . . . ." (<u>Id.</u> at 66, 81, 187-90 and Ex. 14; Finch Dep. at 49-54, 66-67 and Ex. 1, pp. 1440, 1442.)[5]

In the summer of 2006, Plaintiff began his third year in the medical school program with an Internal Medicine rotation; "towards the end of [this] rotation, [Plaintiff's condition] got really bad, and [this development] coincided with a devastating injury that [his] grandmother incurred." (Halpern Dep. at 81.) Plaintiff left to be with his grandmother and, upon his return, began acting "really weird"[6] because he was "on a stimulant and [he] ha[d]n't

---

[5] Due to these problems, Plaintiff obtained a delay of his test date for the national examination he had to pass to progress to his third year in the program, but did not disclose his ADHD diagnosis to medical school personnel. (Halpern Dep. at 65-66, 68, 70-72, 200-02; Ernest Aff. at ¶¶ 9-13, 15-16, 31 and Ex. A-E, G; Ernest Dep. at 17-21.) Plaintiff passed the examination on June 13, 2006. (Reifler Aff. at Ex. U, p. 93.)

[6] For example, Dr. Ernest documented a "confusing" conversation he had with Plaintiff, on August 14, 2006, where Plaintiff, who was scheduled to make up an examination for his Internal Medicine rotation that day, sought a further delay because he had been away from school taking care of his grandmother; according
(continued...)

slept for a long time"; as a result, medical school personnel asked Plaintiff to obtain a psychiatric evaluation before continuing with the rotation (which he did, although he still did not reveal his ADHD diagnosis to Defendant). (<u>Id.</u> at 82; Ernest Aff. at ¶¶ 20, 21 and Exs. H, I and J; Ernest Dep. at 11-15, Ex. 28.)

Plaintiff completed his Internal Medicine rotation, but received a failing grade. (Halpern Dep. at 22, 48, 202 and Ex. 20, p. 838; Ernest Aff. at ¶ 17.) The written evaluation of Plaintiff's performance during said rotation observed that his "largest obstacle was his frequent lapses in professionalism." (Halpern Dep. at 202, Ex. 20, p. 838.) Examples included:

1) Plaintiff "was known to raise his voice and prolong rounds with repeated statements as to why his diagnosis [of a patient] was correct." (<u>Id.</u> at Ex. 20, p. 838);

2) Plaintiff "failed to keep the required patient log of diagnoses and procedures, as well as the house staff and faculty with whom he worked. He was unable to work effectively with the Academic Computing department to resolve this issue." (<u>Id.</u>);[7] and

3) "Despite numerous one-on-one conversations with [medical

_____

[6](...continued)
to Dr. Ernest, Plaintiff said "that his grandmother . . . was alive only because . . . he learned that three medical teams had not been able to diagnose her pulmonary edema and other problems that he himself was able to identify. At the same time, he is concerned that his medical knowledge is insufficient for him to take the examination." (Ernest Aff. at Ex. H.)

[7] Plaintiff's conduct in this regard undermined the evaluation process: "On many occasions, housestaff and faculty approached [the rotation director] with their concerns about [Plaintiff's] professionalism and performance, but due to [his] failure to complete the required electronic log, these comments [we]re not represented in [his documented] feedback." (Halpern Dep. at Ex. 20, p. 838.)

school personnel], [Plaintiff] failed to change his behavior . . . [and instead] reported that he preferred to make mistakes and fix things on his own." (Id.)

On September 12, 2006, Plaintiff advised the Associate Dean for Student Services, J.M. Ernest, M.D., that he needed to take a leave of absence. (Ernest Aff. at ¶ 22, Ex. K.; Halpern Dep. at 84-85.) Plaintiff later produced a letter from a physician confirming his need for a medical leave, but did not disclose his ADHD diagnosis. (Ernest Aff. at ¶¶ 24, 31 and Ex. M.) That medical leave continued until January 26, 2007, when Plaintiff's physician approved his resumption of studies. (Halpern Dep. at 84-85, 205-06 and Ex. 21; Ernest Aff. at ¶¶ 24, 28 and Ex. Q.)

While on medical leave, Plaintiff successfully worked with his physician "to discontinue the Aderol [sic]" in favor of "other [ADHD] medications." (Halpern Dep. at 83.) Upon his return to the medical school, Plaintiff assumed Special Student status and worked on a research project. (Halpern Dep. at 84-85; Ernest Aff. at ¶ 29.) Under the medical school's policies, the SPPC (the committee that monitored student progress) reviewed Plaintiff's situation, placed him on Academic and Professional Probation, and required him to repeat the Internal Medicine rotation. (Halpern Dep. at 104-05, 206-07 and Ex. 22; Reifler Aff. at ¶¶ 11, 17, Ex. F, pp. 670, and Ex. U, p. 145; Ernest Aff. at ¶ 30, Ex. R.)

In April 2007, Plaintiff resumed clinical rotations and his anticipated graduation date was reset from May 2008 to May 2009. (Reifler Aff. at Ex. U, pp. 139, 146.) Plaintiff began with a Neurology rotation. (Halpern Dep. at 89.) At that point, under the direction of his physician, Plaintiff "was trying new medications . . . for ADHD, which was affecting [his] organizational skills . . . . In addition to that, . . . after a long time of . . . not having trouble sleeping, all of a sudden [he] began having trouble sleeping again." (Id. at 89-90.)

Because Plaintiff "anticipated that [he] would have trouble with the sleep issues sometime in that rotation while [he and his physician] were figuring out [medication] dosages" (id. at 90):

> [Plaintiff] went to speak with Dr. Ernest . . . [a]nd said, "What are going to be the implications of requesting an accommodation that is going to allow me to [do] two things." One, . . . [telling] the Rotation Director for Neurology ["]I have a problem that is going to affect the way that I present things in an organized or disorganized fashion[.]" And two, get an accommodation that . . . if for some reason I don't get sleep for a night that I can call . . . to say, "I need to come in late," or "I need to come in the following day to make it up at a future date . . . ."

(Id. at 90-91.) Dr. Ernest "dissuaded [Plaintiff] from emailing the [Neurology] Rotation Director directly and notifying her of this problem." (Id. at 92.)[8] Plaintiff nonetheless "passed [the Neurology rotation], but there were marks [on his evaluation] saying that [he] sort of low passed certain areas of that rotation,

---

[8] In describing this interaction, Plaintiff did not assert that he revealed his ADHD diagnosis or the medications he was taking. (Halpern Dep. at 90-92.)

including presentation and things like that." (Id.)

Plaintiff only had sought the foregoing accommodation as a temporary measure until he and his physician "g[o]t the medication fixed. And, of course, [they] did get it fixed midway through [Plaintiff's] next rotation [after Neurology]." (Id.) Nonetheless, in the fall of 2007, Plaintiff missed part of his re-scheduled[9] examination for a Family Medicine rotation. (Id. at 209-11, 214-18.) "[T]here was a miscommunication where [Plaintiff] scheduled one of the exams and then [he] didn't show up for the second one. . . . [Plaintiff] thought it was scheduled the same day or the following day or something like that, and [he] just didn't show up for it." (Id. at 211.) "[T]he misunderstanding . . . was probably [Plaintiff's] fault." (Id. at 216.) He "sincerely apologized for this, because [he] believe[d] it was [his] error." (Id. at 217-18.) Although the Family Medicine rotation director allowed Plaintiff to take the second part of the examination at a later date, she indicated that his conduct raised a "professionalism" issue. (Id. at Ex. 24, p. 993.)

On the afternoon of Sunday, December 2, 2007, Plaintiff e-mailed Dr. Ernest as follows:

> Would it be possible to obtain an extra time accommodation on the surgery shelf exam? I believe I must put my ego aside in order to accurately portray my knowledge and allow me to concentrate on learning as opposed to compensatory test-taking techniques. I did

---

[9] The rotation director allowed Plaintiff to miss the original test date to attend to one of his grandmother's health issues. (Halpern Dep. at 209-10.)

not honor my internal medicine rotation for the simple reason of not finishing the exam, and should not allow myself to make the same mistake twice. As we discussed previously, I can provide you with more than ample documentation from the Emory office of disability services. It would be highly beneficial if I could provide you with the needed documentation over the upcoming break immediately following my surgery rotation.

(Id. at Ex. 25, p. 1112.)

That evening, Dr. Ernest responded:

We would need to discuss and document any disability before the accommodation may be given. I'll be happy to meet with you to discuss. When is the shelf exam? I'll be out of town this week, but could review them if you can send them by e-mail, or [another administrator] can meet with you in my absence. Please call the office to set up a time to meet . . . . Just let me know what you would like.

(Id.)

Plaintiff then replied in pertinent part:

The exam is scheduled for next Friday [the 14th]. I would be happy to document the disability and accommodation request in this email that way I am not absent from the service. Although, I would be glad to meet with you after the exam if any clarification or additional documentation is necessary. In the mean time please let me know if I can answer any additional questions. Disability: ADHD. Previous accommodations: untimed exams, quite [sic] testing environment, audio materials. Requested accommodation: untimed shelf exam.

(Id. at Ex. 25, pp. 1111-12.)

The next morning, Dr. Ernest e-mailed Plaintiff back to reiterate that the medical school would "need to see the actual documentation from the provider who examined [him] before [it] can make a decision about accommodations." (Id. at Ex. 25, p. 1111.)

-12-

Dr. Ernest also again made clear that another administrator would make time to see Plaintiff that week (and even offered to facilitate the meeting). (<u>Id.</u>) The following evening, Plaintiff, however, continued to press Dr. Ernest to grant the accommodation before Plaintiff met with any administrator: "I will ask [my treating physician] to write a letter or email for you to review. I would be glad to meet with you or [another administrator] any time after the exam. Would that be expectable [sic]?" (<u>Id.</u>)

Dr. Ernest responded the next morning (Wednesday, December 5, 2007) by repeating that "[t]he process for receiving accommodations is for the student requesting accommodations to meet with a dean prior to the accommodations being implemented, provide the information that documents their need for an accommodation, allow [the dean's] office time to review the request, and then [the dean's] office notifies the student about the request." (<u>Id.</u>) Again, Dr. Ernest offered to arrange a meeting for Plaintiff with another administrator during Dr. Ernest's absence, but emphasized that the medical school "cannot provide accommodations without following th[e] process [he had described] . . . ." (<u>Id.</u>)

The following day, Plaintiff e-mailed Dr. Ernest to say that he had not "been able to acquire a letter from a physician [and that] . . . [i]t will be very difficult for [him] to do so before the exam as [he] is in surgery all day." (<u>Id.</u> at Ex. 25, p. 1110.) Dr. Ernest promptly replied that, "[u]nless [the medical school]

ha[d] clear documentation of a disability, [it] [was] not able to consider accommodations. Based on [that] policy, [Plaintiff] will need to take the exam under standard conditions." (<u>Id.</u>) Plaintiff then requested a meeting with Dr. Ernest "early Monday morning," December 10, 2007, because he planned to "dig through [his] records this weekend and should be able to find something confirming the [diagnosis]." (<u>Id.</u>) Because Dr. Ernest already had an 11-hour day booked up on that Monday, he stated that he would "be happy to review the documentation if [Plaintiff would] leave it for [him] and then [he would] contact [Plaintiff]." (<u>Id.</u>)

Plaintiff did not leave any such documentation for Dr. Ernest or otherwise schedule a meeting with an administrator during the week before the examination; instead, at 9:27 a.m., on Friday, December 14, 2007, Plaintiff's physician e-mailed Dr. Ernest (with a copy to Plaintiff) verifying that Plaintiff "ha[d] been under [his] care for treatment of attention deficit disorder[,] . . . ha[d] received treatment for this for several years and ha[d] psycho educational testing documentation." (<u>Id.</u> at Ex. 28.) The e-mail then stated: "[Plaintiff] will take his surgery shelf exam today. I am requesting that he receive accommodations for his ADD if it is possible. Appropriate accommodations for ADD include extra time to complete the exam (50% extra time is fairly standard) and a less distracting environment in which he can take his test." (<u>Id.</u>) A handwritten notation by Dr. Ernest dated December 14, 2007

-14-

(on a print-out of said e-mail) reflects that "[t]his e-mail was brought to [his] attention by a phone call from [Plaintiff] who came to [the Office of Student Services] around 12:30 (test scheduled for 1PM) requesting accommodations. He was allowed 50% additional time and a non-distracting environment." (Id.)[10]

In November 2008, the Associate Dean for Admissions, Lewis Nelson, M.D., informed Burton Reifler, M.D., the Interim Associate Dean for Student Services (in place of Dr. Ernest, who left the medical school in 2008), that Plaintiff (a recipient of a financial aid award from the medical school) had not submitted appreciation letters to donors, despite having signed a statement affirming his understanding of this requirement and having received repeated reminders from medical school personnel. (Reifler Aff. at ¶ 15, Ex. L.) Moreover, when confronted directly about the matter, Plaintiff "claimed he did not know he needed to write letters." (Id. at Ex. L.) In reporting this matter, Dr. Nelson included a handwritten note that stated: "This is not professional behavior." (Id.) As a result, Dr. Reifler reviewed Plaintiff's student file and discovered both that Plaintiff previously had been placed on

_____

[10] Plaintiff confirmed in his deposition that: 1) Dr. Ernest explained to Plaintiff that Plaintiff had to provide documentation before he could receive any accommodation; and 2) Dr. Ernest granted the accommodation Plaintiff requested regarding his surgery shelf examination when his physician provided documentation. (Halpern Dep. at 220.) According to Plaintiff, he requested this accommodation "[b]ecause he needed it, and because on other exams, [he] was willing to sacrifice points, knowing full well that [he] would not finish the exam . . . and also miss questions simply because [he] was being distracted[,] . . . . [but that] [t]he surgery shelf [wa]s too detrimental to [his] career, so [he] decided to ask for this accommodation . . . ." (Id. at 219.)

-15-

Academic and Professional Probation and that the file contained "voluminous documentation of unprofessional conduct by [Plaintiff] that had occurred throughout his medical school career, as reported by various members of the School of Medicine's faculty, administration and staff." (Id. at ¶¶ 16, 17.)[11]

Dr. Reifler recognized that, under medical school policy, unprofessional conduct by a student placed on such probation warranted review by the SPPC and he instigated such action. (Id. at ¶¶ 18, 19 and Ex. F, pp. 670; Reifler Dep. at 10-19, 23-24 and Ex. 13, p. 1272.)[12] On November 24, 2008, the SPPC designated two members to examine and to summarize Plaintiff's student record at a later meeting; it also required Plaintiff to submit documentation from a physician as to his continued fitness for medical school. (Reifler Aff. at ¶¶ 21-22.) That same day, Dr. Reifler e-mailed Plaintiff to advise him that the SPPC "ha[d] concerns related to

_____

[11] Examples cited by Dr. Reifler included "repeated incidents of tardiness and absences from required courses or meetings, missed appointments and examinations, failure to complete required assignments, rude and belligerent behavior toward faculty, administrators and staff, and failure to respond to communications on school-related matters." (Reifler Aff. at ¶ 16.)

[12] "[P]rofessionalism has been a key part of the [medical school's] curriculum goals . . . since before [Plaintiff] enrolled . . . ." (Applegate Aff. at ¶ 11.) Indeed, "professional attitudes and behaviors" constitute one of the curriculum's "seven overall goals." (Id.) Moreover, "professionalism has received greater attention recently among medical schools and in the accreditation of hospitals and health care organizations." (Id. at ¶ 7; see also id. at ¶¶ 8-10 (citing fact that recent studies have shown "the importance of professionalism among physicians and health care providers in the delivery of quality patient care" and that, in July 2008, the entity "responsible for accreditation of health care organizations . . . updat[ed] its accreditation standards . . . to include specific requirements related to addressing disruptive and inappropriate behaviors [by health care providers] . . . [because such] 'behaviors can foster medical errors, contribute to poor patient outcomes, increase the cost of care, and cause qualified clinicians, administrators and managers to seek new positions in more professional environments'").)

-16-

issues of professionalism that have occurred at various times while [Plaintiff] ha[d] been a medical student," that Plaintiff would have to provide medical documentation of his ability to remain in the program, and that Plaintiff should plan to appear at an upcoming meeting where the SPPC would make "a full review of [his] record as a medical student." (Id. at ¶ 23, Ex. P.)

A week later, Plaintiff submitted a note from Doreen Hughes, M.D., verifying that "[i]n [her] medical opinion there is no reason [Plaintiff] cannot participate in medical school." (Id. at ¶ 25, Ex. T.) The two designated committee members thereafter reviewed Plaintiff's student file and prepared separate, detailed summaries for the SPPC. (Id. at ¶ 25, Exs. R, S.) Both summaries highlighted multiple instances of unprofessional conduct by Plaintiff in a variety of settings across his entire time in the medical school program, including (in addition to events in the spring through early fall of 2006 and matters related to his Family Medicine examination in the fall of 2007, detailed above):

1) incidents in August 2004, when Plaintiff acted abusively toward information technology staff (id. at Ex. R, p. 1061, and Ex. S, p. 1060);

2) Plaintiff's absence from at least part of a required lecture in October 2005 and his inappropriate response when confronted by medical school personnel about the situation (id. at Ex. R, p. 1061, and Ex. S, p. 1060);

3) instances of tardiness or absence during Plaintiff's remediation of his Internal Medicine rotation in the summer of 2007 (<u>id.</u> at Ex. R, p. 1064, and Ex. S, p. 1059-60);

4) Plaintiff's "disinterested" attitude and inability to accept constructive criticism during his Obstetrics and Gynecology rotation in January and February 2008, resulting in a recommendation that "he be more humble" and "realize that rules apply to him as well as [others]" (<u>id.</u> at Ex. R, p. 1065, and Ex. S, p. 1059); and

5) Plaintiff's failure not only to timely submit appreciation letters in the fall of 2008, but also to treat medical school personnel respectfully in connection with that issue (<u>id.</u> at Ex. R, p. 1065, and Ex. S, p. 1060).

On December 19, 2008, the SPPC reconvened; at that time, it had an opportunity to review Plaintiff's entire student file, to consider the two designated committee members' summary reports, and to hear from Plaintiff. (<u>Id.</u> at ¶¶ 25-29, Ex. V; Halpern Dep. at 96-99.) According to the meeting minutes, the SPPC first "reviewed [Plaintiff's] records as a medical student . . . [and then] scrutinized [the] capsulated reviews of [his] history . . . [and the] note from [his physician] . . . . Following rich discussion, the committee members agreed that they were uncomfortable with

[Plaintiff] graduating with his 2009 class due to his repetitive unprofessional actions . . . ." (Id. at Ex. V, pp. 1025-26.)[13]

The SPPC thereafter heard from Plaintiff; the meeting minutes summarize those events as follows:

> When [Plaintiff] entered, [the SPPC vice-chair] summarized that the Committee wanted to meet with him because of this repeated unprofessional behavior. [Plaintiff] addressed the Committee's concerns. He stated that he has taken the necessary steps to establish organization by implementing a system to increase his organizational skills. [Plaintiff] thanked the Committee for their concern regarding his insight; he stated these incidences were isolated and he's addressed them. He assured the Committee that he's addressed all questionable professional behavior from the past five years of medical school. He guaranteed the Committee by stating, "there would not be any professional issues now and later in his career". [Plaintiff] also stated to the Committee that, "past performance doesn't yield future indications of performance". [Plaintiff] noted to the Committee that since [the issue of rudeness] has been brought to his attention . . . it will help him alleviate this perception. [Plaintiff] also stated that he was open to constructive criticism and that the reports that he is not reflect a grave misunderstanding. When asked why [he] did not write financial aid thank you letters, [Plaintiff] stated that he forgot and that this was also a misunderstanding. During the committee's discussion with [Plaintiff], [the vice chair] asked [Plaintiff] if he agreed with his physicians' opinion that he is in condition to perform optimally in the medical curriculum and be evaluated on that basis. [Plaintiff] said he agreed with that assessment.

(Id. at Ex. V, pp. 1027-28.)

"Following [Plaintiff's] departure, the Committee concluded that there has been a common thread of lack of professionalism throughout [Plaintiff's] medical career that does not appear to

---

[13] The minutes list examples of such acts that largely mirror the two summaries. (Compare Reifler Aff. at Ex. V, pp. 1026-27, with id. at Exs. R, S.)

have improved with time and experience.  The observations suggest a lack of insight and aspects of character that preclude his ability to function as a medical professional." (Id. at Ex. V, p. 1028.)  As a result, a motion was made "to recommend [Plaintiff's] dismissal from [the medical school] due to a repeated pattern of unprofessional behavior . . . and it was approved unanimously." (Id.)  Dr. Reifler advised Plaintiff of this decision in writing:

> I regret to inform you that the [SPPC] has voted to recommend your dismissal from medical school.  This is on the basis of repeated instances of unprofessional conduct, including inappropriate and argumentative behavior, numerous instances of being late or absent from required assignments, failure to respond in a timely manner to e-mails and pages, and failure to submit required thank you letters to scholarship donors in spite of repeated reminders.

(Halpern Dep. at Ex. 3 (emphasis added).)

Plaintiff appealed to the Academic Appeals Committee. (Halpern Dep. at 125-26, Ex. 5; Ernest Aff. ¶ 33, Ex. Z.)  In his four-page appeal letter, Plaintiff did not contest the unprofessional conduct found by the SPPC,[14] but instead identified three factors that allegedly led to his behavior:

---

[14] To the contrary, Plaintiff admitted a "tendency to be overly defensive when [he is] challenged; intolerant of others whose actions are not convenient to [him]; sarcastic and rude; and occasionally impulsively abrupt when [he is] under stress and not in full control of [his] situation or environment (as [he] was when [he] met with the [SPPC])."  (Halpern Dep. at Ex. 5, p. 1031.) Plaintiff further stated that he recognized in himself a characteristic (described in a book he recently read) such that when "'momentarily stripped of control [he experiences] waves of anxiety and shame lead[ing] to defensive reactions and focusing on how others enrage and disappoint [him].'" (Id. at Ex. 5, p. 1032.)  Finally, Plaintiff confessed a "tendency to be arrogant," despite having been raised in a faith that taught him the value of "humility."  (Id.) In sum, Plaintiff's appeal letter acknowledged that the SPPC "held up a mirror for [him] to take a long painful look at [him]self, and [that he was] embarrassed to see [him]self as [the SPPC] d[id]."  (Id.)

1) an inability to handle stress appropriately, "especially when [he] feel[s] over-extended instead of achieving a good work-life imbalance [sic]" (Halpern Dep. at Ex. 5, p. 1032);

2) his direct and aggressive manner (which he attributed to his upbringing in Israel and his more recent, post-collegiate experience working in his family's real estate business in the United States), which clashed with the interpersonal style of "Americans generally and especially southern Americans" (id.); and

3) his diagnosis of ADHD and the side effects of the medications he took as a result (matters he now recognized he mistakenly had asked the SPPC not to consider) (id.).[15]

In light of these three considerations, Plaintiff requested permission to complete medical school and to graduate as scheduled in May 2009, subject to "strict probation." (Id.) He committed to seek a "multidisciplinary assessment" with the assistance of Dr. Hughes, to undertake individual therapy to improve his interpersonal skills and to address related issues, and to attend a multi-day program for "distressed physicians." (Id.)

Dr. Hughes wrote two letters for Plaintiff's appeal. (Reifler Aff. at ¶ 33, Exs. AA, BB.) In the first, she stated that she had

---

[15] As to the third factor, Plaintiff asserted that he should have conveyed to the SPPC the degree to which, in the time leading up to his medical leave of absence at the start of his third year in the program [i.e., the spring through early fall of 2006], his behavior was "intertwined with or at least influenced by medication side effects, leading [him] to take a year off to address these issues." (Halpern Dep. at Ex. 5, pp. 1032-33.) "At no time during [the SPPC hearing] did [Plaintiff] state that any of his behavioral problems were related to a medical condition or impairment, or a possible disability. Nor did he request any type of accommodation." (Reifler Aff. at ¶ 27.)

treated Plaintiff for ADHD and Anxiety Disorder since May 2008 and that, in her view, his unprofessional behavior had "multifactorial" causes, including:

> [Plaintiff]'s experiences growing up in Israel related to survival of severe trauma, family dynamics and family modeling concerning appropriate interpersonal communication, on-going exposure to first-hand accounts of the Holocaust, and psychiatric diagnoses of ADHD and anxiety disorder. This has resulted in a personality style in which self-reflection has not been a top priority and the default response in times of stress combines rigidity, defensiveness and impulsivity. An additional component is [Plaintiff]'s failure to recognize the fact that he defaults to these behaviors when under stress. He is becoming more conscious of each of these factors and of their interaction. This developing consciousness is providing the groundwork for change. [A social worker and a substance abuse counselor who each assessed Plaintiff] and I share the professional opinion that [Plaintiff] is capable of change and has begun the process.

(Id. at ¶ 33, Ex. AA.)[16]  In her second letter, Dr. Hughes reported that Plaintiff had made an "impressive start" toward improved self-awareness and behavior, but that "the task of making major behavioral changes will be a process that will continue in the future." (Id. at ¶ 33, Ex. BB.)

The Academic Appeals Committee upheld the recommendation of dismissal (after reviewing relevant documents and hearing directly from Plaintiff), as did William Applegate, M.D., the medical school's Dean (who first reviewed the pertinent materials and met personally with Plaintiff). (Id. at ¶¶ 34, 37, 38 and Ex. DD;

---

[16] Dr. Hughes's comments about Plaintiff's family history must be viewed in context with Plaintiff's statement in his appeal letter that he was "not a victim of abuse at home," (Halpern Dep. at Ex. 5, p. 1032).

Applegate Aff. at ¶¶ 6, 14-16 and Exs. A, C-L.)[17]  According to Dr.

Applegate, "[his] decision to dismiss [Plaintiff] from the School

of Medicine was related to concerns with his conduct and

unprofessionalism which occurred over an extended period of time."

(Applegate Aff. at ¶ 7.)[18]  In assessing Plaintiff's request to

graduate with his class based on his willingness to undertake

therapy to improve his interpersonal skills, Dr. Applegate "did not

think that it was logical that the School of Medicine graduate

someone who said he would need counseling regarding his

inappropriate behavior because once he was a licensed physician, he

might continue to need ongoing counseling for years in order to try

to overcome or manage behaviors that were inappropriate to the

practice of medicine."  (Id. at ¶ 22.)

---

[17] Plaintiff's appeal letter to Dr. Applegate mirrored his letter to the Academic Appeals Committee.  (Compare Reifler Aff. at Ex. Z with id. at Ex. FF.)

[18] Examples cited by Dr. Applegate included incidents:  1) in August 2004, where Plaintiff acted abusively toward information technology staff (after which Dr. Ernest counseled him about professionalism) (Applegate Aff. at ¶ 17; 2) in the fall of 2005, when Plaintiff signed a form indicating he attended a lecture, part of which he missed (id. at ¶ 27); 3) during the summer of 2006, involving Plaintiff's handling of the entry of required patient log data for his Internal Medicine rotation and his related interactions with medical school personnel (id. at ¶¶ 19, 24); 4) in the fall of 2007, when Plaintiff failed to appear for part of his Family Medicine rotation examination (id. at ¶ 26); and 5) in the fall of 2008, where Plaintiff behaved unprofessionally toward staff (regarding the appreciation letters to donors) (id. at ¶ 20).  According to Dr. Applegate, "the way that medical students interact with staff at the medical school is important . . . [because] [s]ometimes people control themselves in certain situations and put on their best behavior [when faculty are present] but then demonstrate their true character towards others . . . [and because] physicians in medical practice must interact not only with peer physicians but with nurses and medical staff, who are important to the delivery of medical care."  (Id. at ¶ 20.)  "Due to the nature of the medical profession, these interactions [between physicians and staff] regularly take place under extremely stressful circumstances."  (Id. at ¶ 13.)  Dr. Applegate also emphasized Plaintiff's "problems with attendance and compliance with a schedule" because it "would certainly be problematic for patient care for physicians to disregard schedules or fail to be responsive to pages at times scheduled for work."  (Id. at ¶ 26.)

Dr. Applegate further explained his decision as follows:

If [the medical school] had identified a problem that was
inconsistent with quality medical care, then I questioned
why we should graduate someone and put them in a position
to interact with patients when they had demonstrated
behaviors that we thought were inconsistent with good
quality medical practice. That was a factor for me. <u>By
granting a degree, we are stating to the public that the
graduate has met the requirements for the degree and is
prepared to enter into the practice of medicine</u>. In
[Plaintiff's] case, <u>I did not think that he met the
requirements or was prepared to practice medicine</u>.

. . . <u>I considered whether we could extend [Plaintiff's]
medical school for some additional period, such as
repeating his fourth year.</u> But, as I considered that
alternative, I also thought that there was a very high
risk of recidivism and belligerent behavior later, even
if he managed to control himself around staff and
physicians for a few months or another year. I did not
think that we would develop sufficient additional
information within a year's time that he had the
appropriate level of professionalism. <u>Given all of the
incidents of inappropriate behavior over an extended
period of time, I felt certain that he ultimately would
relapse in his unprofessional behaviors even if he
controlled himself for six months or a year.</u> I thought
he might say or do whatever it took to get through the
last months of medical school, and I did not trust him to
be able to make a lasting change in his behaviors. He
had already been given multiple chances to correct his
behavior and demonstrate professionalism . . . .

        . . . .

. . . <u>I consider[ed] the potential usefulness of
obtaining an outside assessment of [Plaintiff] from some
group focused on dealing with physicians with disruptive
behaviors</u> . . ., but ultimately I did not think it would
prompt me to reach a different result. . . . [T]here are
programs available to help deal with physicians with
inappropriate disruptive behaviors; but those programs
exist because a physician developed behavior issues or
was licensed before the problems were recognized. Since
we had recognized the behavior problems before
[Plaintiff] was licensed, I questioned why we should
allow him to get licensed and then have him in need of

those programs . . . .  I did not think those programs were designed to evaluate medical students or predict their chances of remediation.  While I did not think [Plaintiff] was going to change his behaviors over the long term, ultimately, <u>I thought [the medical school] bore responsibility for determining whether [Plaintiff] met our professionalism standards.  I felt that we already had all of the information that we needed, and I did not think it would have been appropriate to delegate responsibility to an outside entity that might see [Plaintiff] over the course of a few days or weeks (when he knew he was being evaluated or scrutinized) when we had seen [Plaintiff's] interactions and behaviors over an extended period and in interactions with a number of people.</u>

         . . . .

The School of Medicine has a weighty obligation to the public to ensure that it only confers medical degrees upon students who are qualified to render patient care.  <u>Based on [Plaintiff's] pattern of behavior during his medical school career, I concluded that he was not qualified to be a successful medical student or physician.  The thought of someone like [Plaintiff] practicing medicine with these sorts of core behaviors, even in a supervised capacity as a resident, terrified me.</u>  I was concerned about future patients and would not have wanted [Plaintiff] treating patients, whether I knew them or not.  <u>I firmly believed, and still believe, that medical school faculty and administrators such as myself are responsible for exercising our best judgment, as medical professionals and educators, to prevent individuals like [Plaintiff] from graduating and going on to practice in a profession for which they are neither qualified nor suited.  Had I allowed [Plaintiff] to graduate from medical school, knowing what I did about his demonstrated behavioral shortcomings, I would have failed to uphold this responsibility and I believe it would have put patients at risk.</u>

As I considered [Plaintiff's] letters and request, <u>I did not understand his request to be a suggestion of a reasonable accommodation of a disability.  I understood it to be a request for a plea of mercy and yet another chance.</u>  It appeared to me that [Plaintiff] had already been given multiple chances to improve and had already

been on probation previously. I did not feel that we had to give him yet another chance.

[Plaintiff] was not dismissed from the School of Medicine because of his ADHD, Anxiety Disorder, or any other medical condition or impairment. Instead, <u>he was dismissed for a pattern of unprofessional behavior throughout his medical school career, which demonstrated that he did not satisfy the University's professionalism standards</u>.

. . . I did not think that any diagnosis of ADHD . . . explained the lack of professionalism throughout the time that [Plaintiff] had been in medical school. I did not think that the lack of professionalism that [Plaintiff] had displayed was attributable to ADHD (or any disability) or to any medications that I understood would have been prescribed for ADHD. Regardless, <u>[Plaintiff] also indicated that he then had the medications under control, and yet there still were problems with him following through on directions, doing what he was supposed to do, and treating staff appropriately.</u> Even after all the other warnings and incidents, he failed to write thank you notes on a timely basis in spite of repeated requests from staff, he was less than responsive in communications with Dr. Reifler, and he was belligerent towards the staff over the Dean's letter when he contacted them after the established deadline for providing feedback had already passed.

<u>Ultimately, after considering this matter over a period of several weeks, including considering what [Plaintiff] had presented in his letter to me, and my review of his Student Services file, I determined that he should be dismissed from the School of Medicine.</u> I agonized over the decision and did not take it lightly. <u>The dismissal was based on a pattern of unprofessional behavior throughout his medical school career and his failure to demonstrate professionalism consistent with the School of Medicine's goals and requirements.</u> I considered other alternatives, including what [Plaintiff] put in his letter to me, but <u>I ultimately determined that his professionalism was inconsistent with graduation and the practice of medicine. While he requested a last chance, [Plaintiff] had already been given multiple chances by the School and that [sic] I had an obligation as Dean of the School of Medicine to enforce the School's requirements for earning a degree.</u>

(<u>Id.</u> at ¶¶ 22-23, 28, 30-34 (internal paragraph numbers omitted) (emphasis added).)

Plaintiff thereafter commenced this litigation and, at least by the time of his deposition, his position (taken during his administrative appeal) of accepting the SPPC's judgment that he had engaged in unprofessional behavior (<u>see</u> <u>supra</u> p. 20 & n.14) had shifted significantly; specifically, Plaintiff asserted (in response to the question, "do you believe that the members of the SPPC had good reason to think you had engaged in unprofessional behavior?") that the SPPC members had been "misled by inaccurate and incomplete documentation, which may have falsely affected their . . . judgment" (Halpern Dep. at 95). When asked if the medical school's findings about "behavioral issues involving being rude, not treating others well, attendance and not being timely, and not being responsive" were "meritorious and accurate," Plaintiff replied: "Some. Is [sic] a key word – some were, and some were not. I don't – I absolutely will not give you a blanket statement that they were all true, because they weren't. Some of them were misquoted, some of them were taken out of context – many of them were taken out of context." (<u>Id.</u> at 133.)

Other changes in Plaintiff's viewpoint occurred between his administrative appeal and his deposition. For example, in his appeal letter, Plaintiff acknowledged a "tendency to be . . .

sarcastic and rude." (_Id._ at Ex. 5, p. 1031.) He substantially altered that concession in his deposition testimony:

> [R]egarding the rudeness, I would say that oftentimes when you are on this medication, especially when I was having the acute reaction, if you will, then it does make you _aggressive_.
>
> And even though I didn't mean to be rude, _I probably was perceived as being rude_. Which, by the way, is what that blind spot that Dr. Reifler was talking about was; wasn't meaning to be rude, but I was perceived as being rude, even though I didn't mean to be.
>
> And that is sort of – _that is a bad side effect of these medications_.

(_Id._ at 133-34 (emphasis added).) In addition to the above-quoted passage in which he denied ever actually behaving rudely and instead admitted only medication-induced "aggressive[ness]" that "probably was perceived as being rude" (_id._ at 133-34), Plaintiff also insisted in his deposition (contrary to his prior admission of a "_tendency_ to be . . . sarcastic and rude" (_id._ at Ex. 5, p. 1031 (emphasis added))):  "It is not like I go around being rude or hostile on a _regular_ basis." (_Id._ at 152 (emphasis added).)[19]

---

[19] Further, in Plaintiff's appeal letter (and the letter he obtained from Dr. Hughes), Plaintiff admitted he had significant difficulty responding appropriately to stressful situations (or, in Dr. Hughes's words, a habit of "default[ing]" to negative behaviors when under stress). (_See_ _supra_ pp. 20-22.) In his deposition, however, Plaintiff stated that, although he is now more attuned to stress, he "also realized that [he] . . . d[id]n't always overreact to stress, if you will.  A lot of those times, if not all, of those instances [when he overreacted to stress], which [we]re listed as reasons for [his] dismissal, were when [he] was on medication." (Halpern Dep. at 132.)  Plaintiff also never mentioned his anxiety disorder in his appeal letter, but when deposed described its "impact . . . on [his] performance at the School of Medicine" as "significant, especially since it was most prominent during periods when [he] was taking medication . . . and it was made much, much worse by a stimulant medication . . . [such that he had] severe, severe anxiety . . . [that made it] really hard to function . . . during that time period." (_Id._ at 227.)

Plaintiff's perspective on the SPPC hearing also changed markedly between the time he wrote his appeal letter and the time of his deposition.  In his appeal letter, Plaintiff described his experience with the SPPC as a difficult, but productive one, in which the committee members "held up a mirror for [him] to take a long painful look at [him]self, . . . [after which he was] embarrassed to see [him]self as [the SPPC] d[id]." (<u>Id.</u> at Ex. 5, p. 1032.)  At his deposition, by contrast, Plaintiff testified that the SPPC "ambushed" him (<u>id.</u> at 130), that the meeting "was essentially an attack," (<u>id.</u> at 97), that the SPPC "brushed to the side" his evidence of positive parts of his record (<u>id.</u>), that he "was really, truly attacked" (<u>id.</u> at 98), that some of the SPPC's questions involved a "serious breach" of "privacy" (<u>id.</u> at 99), and that he "was truly berated" (<u>id.</u> at 102).

When asked "[w]hy is it that you believe that you were dismissed from the medical school," Plaintiff testified:

> [A] large degree of it [was] because I didn't send out thank you letters in time for a scholarship that was given to me by the Medical Guild.  That is a huge part of it.
>
> And that I didn't return phone calls from Dean Reifler [about the letters] when I was out of state . . . on interviews . . . .
>
> That is a large part of it.  A lot of the rest of it was . . . they said a pattern of unprofessional behavior, which would have been corrected had I received accommodations at the time.

(Id. at 93.)[20]  He later elaborated that:

> The behavior that [was] cited in [Dr. Reifler's letter]
> as [the SPPC's] reasons for dismissal with the exception
> of the thank you letter and not being available by phone
> to answer why I didn't send the thank you letter, all of
> those other behaviors occurred during a period where I
> was having a serious medication reaction . . . .

(Id. at 142.)[21]

When pressed as to whether he "believed that all of th[e]

[matters cited in the summaries of his student file prepared by two

different SPPC committee members] are explained away by a

disability," (id. at 229), Plaintiff testified:

> I wouldn't say all.  I would say a large portion,
> especially the ones that are – that are referenced or
> occurred during a particular time or documented and – and
> communicated [sic] a medication reaction to ADHD.  And
> Ambien which was used to treat insomnia induced by
> medication for ADHD was – was occurring, which was a
> large majority of the – the reasons that they used –
> that they said were the reasons for dismissal.
>
> Which, by the way, occurred three years before this
> dismissal, and [sic] did not take action at that time.
> Only – when [sic] they took action when I forgot to send
> out a thank you letter for a scholarship.

(Id. at 229-30.)

---

[20] Plaintiff attributed his failure to return Dr. Reifler's calls to the
fact that the interviews in question "[we]re 7:00 a.m. to 7:00 p.m. and a dinner.
So – and you don't keep your phone on . . . ." (Halpern Dep. at 93.) He further
explained that he "later got an iPhone to correct for that so [he] could check
[his] email [while away from the medical school] . . . ." (Id.)

[21] Plaintiff suggested that his failure to submit the appreciation letters
also may have stemmed from his ADHD, but could not say definitively:  "I simply
forgot to send them, which may be a function of having the ADHD, or I just forgot
to send out thank you letters." (Halpern Dep. at 135.)

Finally, Plaintiff was questioned about how the "accommodation" he sought in lieu of dismissal for the pattern of unprofessional behavior cited by the SPPC would work in practice:

> Q. . . . [W]ould [the medical school] always have to forgive unprofessional behavior?
>
> A. Now, that is an interesting question. I don't think so. Now, I am not going to excuse anyone, including myself, from any standard of behavior. That just wouldn't make any sense.
>
> But . . . the reasonable accommodation, which I was asking, did not state that there – stated that I was going through a process. . . .
>
> . . . One of the things that I learned during this process was that none of this is an instantaneous thing. And that first you – before these behaviors are ingrained forever, when you are really tired and after a 30 hour shift, and it is hard to not revert back to "old behavior," you have to act. You have to act them out until, finally, it is you know, ingrained.
>
> And so, one hundred percent truthful in saying that if I am rude or hostile, I shouldn't be a doctor. But . . . it is not going to be an overnight thing, but I continue to work it throughout this time.
>
> . . . [W]hatever program was implemented, it seems to have, at least, helped. And again, you have to remember that the medication that I was on – the behavior that they are talking about was really during the times where I was having an acute reaction to side effects of the medication.
>
>          . . . .
>
> Q. . . . [H]ow many times would the school be required to give you one more chance?
>
> A. I hope that it is zero. I hope that it is zero. I think it would be zero, just because of what I have learned and that I am no longer on the medication.

. . . [L]ook at my record in medical school, there is --
if you graph out my behavior, there is a definite spike
around the times that we have been discussing.

And there really hasn't been any egregious rudeness or
argumentative behavior after that.

(Id. at 150-52 (emphasis added).)[22]

## DISCUSSION

Defendant has moved for summary judgment on the ground that "no genuine issue of fact exists regarding [Plaintiff]'s claims and Defendant is entitled to judgment as a matter of law." (Docket Entry 28 at 2.) "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008) (quoting Fed. R. Civ. P. 56(c)). In making this determination, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Accord Matvia v. Bald Head Island Mgt., Inc., 259 F.3d 261, 266 (4th Cir.

---

[22] Plaintiff's expert could offer no forecast as to the likelihood that Plaintiff's proposed course of treatment with Dr. Hughes would have brought Plaintiff's behavior into line with the professionalism standards of the medical school program. (See Carr Dep. at 49-50 (responding "I don't know," when asked "what do you think would be the likely outcome of th[e] path [proposed by Plaintiff and Dr. Hughes]?").) Moreover, said expert admitted that he had never referred a medical student to any of the facilities he identified as possible options to assess Plaintiff's prospects for treatment and that he had no knowledge of anyone else ever making such a referral. (Id. at 50-52.)

2001) ("The court must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from the facts in the non-movant's favor.").

"[T]here is no burden upon 'the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact.' Rather, 'the burden on the moving party may be discharged by "showing" – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" Carr v. Deeds, 453 F.3d 593, 608 (4th Cir. 2006) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)) (internal emphasis omitted). Conversely, "[t]he party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but 'must come forward with specific facts showing that there is a genuine issue for trial.'" Emmett, 532 F.3d at 297 (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). See also Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 308 (4th Cir. 2006) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law.").

## Count I – Section 504 of the Rehabilitation Act

"Section 504 of the Rehabilitation Act provides that '[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be

excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.'" <u>Constantine v. Rectors and Visitors of George Mason Univ.</u>, 411 F.3d 474, 491 (4th Cir. 2005) (quoting 29 U.S.C. § 794(a)) (brackets and ellipses in original). As a result, "any 'program or activity' – including all the operations of a university or other postsecondary institution – that receives federal funding must not discriminate on the basis of disability." <u>Id.</u> at 491 (quoting 29 U.S.C. § 794(b)(2)(A)) (internal citations omitted). "In general, a plaintiff seeking recovery for violation of [this] statute must [prove] that (1) she has a disability, (2) she is <u>otherwise qualified</u> to receive the benefits of a public service, program, or activity, and (3) she was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of her disability." <u>Id.</u> at 498 (emphasis added).[23]

---

[23] The disjunctive nature of the two prongs of the third element effectively recognizes that Section 504 creates two different types of claims: "a plaintiff must show that she was [1] excluded from participation in, or denied the benefits of, a program or service offered by a public entity, <i>or</i> [2] subjected to discrimination by that entity." <u>Constantine</u>, 411 F.3d at 499 (citing 29 U.S.C. § 794(a)) (bracketed numbers added) (emphasis in original). <u>Cf.</u> <u>Shin v. University of Md. Med. Sys. Corp.</u>, No. 09-1126, 2010 WL 850176, at *5 (4th Cir. Mar. 11, 2010) (unpublished) (construing ADA as prohibiting both "disparate treatment because of an [individual]'s disability" and "failure to make reasonable accommodations [for an individual's disability]," but noting that, as to either type of claim, plaintiff must show that he was otherwise qualified (internal quotation marks omitted)). In this case, however, Plaintiff does not allege that Defendant subjected him to disparate treatment based on disability (i.e., treatment more harsh than that afforded non-disabled persons), but rather only that Defendant unlawfully denied him continued participation in the medical school program by failing to accommodate his alleged disabilities.

In seeking summary judgment, Defendant focuses primarily on the final two elements of Plaintiff's Section 504 claim, the requirements that: 1) Plaintiff was "otherwise qualified" to continue in the medical school program; and 2) Defendant discriminated against him based on his alleged disabilities via its failure to provide reasonable accommodation (i.e., declining to allow him to remain in the medical school program, while seeking treatment for disability-related, "behavioral" issues). (See Docket Entry 28 at 13-20.)[24] These two lines of argument overlap: "the question of who is 'otherwise qualified' and what actions

---

[24] Defendant's alternative argument that it is entitled to summary judgment on the "disability" element of Plaintiff's claim in light of the reasoning in Sulima v. Tobyhanna Army Depot, 602 F.3d 177 (3d Cir. 2010) (see Docket Entry 28 at 12-13) fails to persuade the Court. "The School of Medicine concedes, for summary judgment purposes only, that [Plaintiff's] ADHD and [ADNOS] may be disabilities." (Id. at 12.) Defendant, however, contends that, because Plaintiff attributes some of his limitations to side effects of medications he took for ADHD and/or ADNOS, Plaintiff also must satisfy Sulima's test regarding when side effects constitute a "disability"; this (according to Defendant) Plaintiff has failed to do. (See id. at 12-13.) By its express terms, Sulima's supplemental requirements regarding side effects as disabilities apply only where the plaintiff "ha[s] not presented any evidence to show that [the plaintiff's underlying impairments] directly substantially limited a major life activity" and instead "was claiming to be substantially impaired solely due to side effects from his prescribed medications." Sulima, 602 F.3d at 185 (emphasis added). See also id. at 185-86 ("[The plaintiff] has health problems that prompt the use of medication, but claims that his impairment under the ADA is based solely on a disorder or condition resulting from the medication, not from the underlying health problem that the medication is meant to treat." (emphasis added)), 186 n.3 ("[T]he plaintiff is claiming a disability only as a result of the side effects of medical treatment for a health problem which is not itself claimed to be disabling." (emphasis added)). For purposes of the instant motion, however, Defendant has conceded that Plaintiff's ADHD and ADNOS constitute disabilities (and thus that they substantially limit at least one of his major life activities). Moreover, in light of Plaintiff's reliance on Dr. Hughes's statement attributing Plaintiff's difficulties to both his underlying mental impairments and his related medications, the record does not establish that Plaintiff claims to be disabled solely based on the side effects of his medications (although some of Plaintiff's deposition testimony comes perilously close to doing so). Accordingly, assuming that this Court would adopt Sulima's reasoning, said decision would not apply under the circumstances of this case and Defendant's argument for summary judgment based on Sulima therefore lacks merit.

constitute 'discrimination' under [Section 504] would seem to be two sides of a single coin; the ultimate question is the extent to which a grantee is required to make reasonable modifications in its programs for the needs of the handicapped." <u>Alexander v. Choate</u>, 469 U.S. 287, 299 n.19 (1985). <u>See also</u> <u>Bercovitch v. Baldwin Sch., Inc.</u>, 133 F.3d 141, 154 (1st Cir. 1998) ("[M]any of the issues that arise in the 'qualified' analysis also arise in the context of the 'reasonable modifications' or 'undue burden' analysis. That is, if more than reasonable modifications are required of an institution in order to accommodate an individual, then that individual is not qualified for the program.").

"A plaintiff is 'qualified' if she is 'an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.'" <u>Constantine</u>, 411 F.3d at 498 (quoting 42 U.S.C. § 12131(2)) (ellipses in original).[25] <u>See also</u> <u>Southeastern Community College v. Davis</u>, 442

---

[25] The <u>Constantine</u> Court treated the Rehabilitation Act and the ADA as imposing the same "otherwise qualified" requirement. This approach adheres to a long line of decisions from the United States Court of Appeals for the Fourth Circuit recognizing the propriety of construing most aspects of the Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990, including the "otherwise qualified" element, in an identical fashion, <u>see</u> <u>Baird ex rel. Baird v. Rose</u>, 192 F.3d 462, 468-70 (4th Cir. 1999) (noting that, as to the elements of the two acts, only the causation element differs (i.e., the Rehabilitation Act requires a more demanding showing)); <u>Rogers v. Department of Health and Envtl. Control</u>, 174 F.3d 431, 433 (4th Cir. 1999) ("The two Acts share the same definitions of disability. They also contain the same operative language about discrimination." (internal citations omitted)); <u>Doe v. University of Md. Med. Sys. Corp.</u>, 50 F.3d 1261, 1264 n.9 (4th Cir. 1995) ("Because the
(continued...)

-36-

U.S. 397, 406 (1979) ("An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap."). As this language suggests, "[e]ven though a disabled [individual] is unable to perform the essential functions of a [program], his termination may nevertheless be unlawful if the [program-provider] has failed to reasonably accommodate [his] disability." <u>Myers v. Hose</u>, 50 F.3d 278, 282 (4th Cir. 1995).

However, "Section 504 by its terms does not compel educational institutions to disregard the disabilities of handicapped individuals or to make substantial modifications in their programs to allow disabled persons to participate. Instead, it requires only that an 'otherwise qualified handicapped individual' not be excluded from participation in a federally funded program 'solely by reason of his handicap,' indicating only that mere possession of a handicap is not a permissible ground for assuming an inability to function in a particular context." <u>Southeastern Community College</u>, 442 U.S. at 405. In so ruling, the Supreme Court "struck a balance

---

[25](...continued)
language of the two statutes is substantially the same, we apply the same analysis to both."); <u>Tyndall v. National Educ. Ctrs., Inc. of Cal.</u>, 31 F.3d 209, 213 & n.1 (4th Cir. 1994) (observing that ADA's definition of "qualified individual with a disability" contains "language [that] tracks the definition of 'qualified individual with handicap' under the Rehabilitation Act of 1973" and that "ADA expressly requires its provisions to be interpreted in a way that 'prevents imposition of inconsistent standards for the same requirements under the two statutes'" (internal citations omitted)); accordingly, decisions from either statutory context generally constitute appropriate authority as to questions under either the ADA or the Rehabilitation Act, <u>see</u> <u>Tyndall</u>, 31 F.3d at 213 n.1 ("[W]e rely on case law interpreting the Rehabilitation Act's 'qualified' requirement in determining whether [the plaintiff] was 'qualified' [as required by her ADA claim]."). Congress amended the ADA effective January 1, 2009, <u>see</u> <u>Shin v. University of Md. Med. Sys. Corp.</u>, No. 09-1126, 2010 WL 850176, at *9 n.14 (4th Cir. Mar. 11, 2010) (unpublished); however, neither party has asserted that said amendment affects the resolution of the instant motion.

between the statutory rights of the handicapped to be integrated into society and the legitimate interests of federal grantees in preserving the integrity of their programs: while a grantee need not be required to make 'fundamental' or 'substantial' modifications to accommodate the handicapped, it may be required to make 'reasonable' ones." Alexander, 469 U.S. at 300. Cf. Mullen v. Princess Anne Volunteer Fire Co., Inc., 853 F.2d 1130, 1136 (4th Cir. 1988) ("Some conditions simply are not compatible with certain lines of work."); Newby v. Whitman, 340 F. Supp. 2d 637, 657 (M.D.N.C. 2004) (observing that Rehabilitation Act did not require defendant to accommodate plaintiff allegedly disabled by sleep disorder, anxiety, depression, and hypertension by "provid[ing] an aggravation-free or stress-free environment").

In this case, Plaintiff contends that Defendant failed to accommodate "the behavioral aspects of [his] ADHD [and ADNOS]." (Docket Entry 1 at 3 (emphasis added).) More specifically, Plaintiff asserts that Defendant should not have terminated him from its medical school program "based upon instances of inappropriate and argumentative behavior, tardiness and failure to submit thank you letters to scholarship donors"[26] because that conduct "resulted from" his mental impairments (and/or medication he took for them). (Id. at 4.) Defendant, however, seeks summary

---

[26] The Court notes that Plaintiff's above-quoted characterization of Defendant's basis for his dismissal somewhat understates the case (or even his own prior characterization of his behavior, see supra p. 20 & n.14).

-38-

judgment on the ground, inter alia, that Plaintiff's "pattern of unprofessional conduct showed that he did not meet the School of Medicine's professional standards." (Docket Entry 28 at 15.)

Defendant's position should prevail because the United States Court of Appeals for the Fourth Circuit long has held that "misconduct – even misconduct related to a disability – is not itself a disability, and [a defendant] is free to terminate an [individual] on that basis." Martinson v. Kinney Shoe Corp., 104 F.3d 683, 686 n.3 (4th Cir. 1997) (citing Tyndall v. National Educ. Ctrs., 31 F.3d 209, 214-15 (4th Cir. 1994), for proposition that defendant did not commit unlawful discrimination "when firing [individual] because of disability-related absences," and Little v. Federal Bureau of Investigation, 1 F.3d 255, 259 (4th Cir. 1993), for principle that "no discrimination [occurred] when [defendant] fir[ed] [individual] for disability-related intoxication on duty").[27] See also Carrozza v. Howard County, Md., 847 F. Supp. 365, 367-68 (D. Md. 1994) ("Where there is misconduct, even if the misconduct was caused by a qualifying handicap, [the Fourth Circuit has] ma[de] it clear that the Rehabilitation Act does not bar termination . . . . Even though that behavior [for which the plaintiff was fired] might have been caused-in-fact by [her] bi-

---

[27] "Although [Plaintiff] was dismissed from an academic institution, discrimination alleged in the context of academic dismissals have typically been evaluated under the same framework as discrimination in the workplace." Jane v. Bowman Gray Sch. of Med. – N.C. Baptist Hosp., 211 F. Supp. 2d. 678, 691 n.22 (M.D.N.C. 2002).

polar disorder, the employer was justified under [Fourth Circuit precedent] in pursuing adverse employment action against her, to and including her termination, for her misbehavior in the work place." (internal parenthetical omitted)), aff'd, No. 94-1593, 1995 WL 8033, at *2 (4th Cir. Jan. 10, 1995) (unpublished; decision without opinion, 45 F.3d 425) ("[T]he 'essential functions' of [the plaintiff's] job included . . . maintaining acceptable standards of conduct within an office environment. . . . The fact that her problems [meeting this standard, due to her rudeness and belligerence,] may have stemmed in part from her mental health conditions does not excuse her failure to perform the essential functions of her job.").[28]

Indeed, the Fourth Circuit has applied the foregoing principle numerous times to affirm summary judgment orders that rejected Rehabilitation Act and ADA claims challenging a defendant's termination of an individual for behaviors that said individual attributed to his or her disability and/or for which said individual sought an "accommodation" of action short of termination. See Darcangelo v. Verizon Md., Inc., 189 Fed. Appx. 217, 218-19 (4th Cir. 2006) (affirming grant of summary judgment on ADA claim to employer that discharged employee who engaged in "aggressive and antagonistic behavior" inconsistent with

---

[28] The Fourth Circuit panel in Carrozza included two distinguished jurists sitting by designation, United States Supreme Court Associate Justice (Retired) Lewis F. Powell and United States District Judge William L. Osteen, Sr.

requirements of her job, notwithstanding evidence "that [such] behavior was related to her bipolar disorder" and "expert [testimony that, instead of dismissal, employer] could have limited [employee's] interactions to supervisors sympathetic to her bipolar condition"); Gasper v. Perry, No. 97-1542, 1998 WL 393708, at *7-8 (4th Cir. July 2, 1998) (unpublished; decision without opinion, 155 F.3d 558) (upholding summary judgment dismissing Rehabilitation Act claim and stating: "[I]t is undisputed that [the plaintiff] suffered from a disability that impaired . . . his ability to judge the appropriate limits of social interaction. . . . Although [the plaintiff] asserts that these instances of misconduct [cited by the defendant as the basis for the plaintiff's termination] were caused by his disability, there is no evidence that the [defendant] terminated [the plaintiff's] employment because of his disability, rather than because of the misconduct. . . . While [prior decisions] involved more egregious misconduct than that for which [the plaintiff] was terminated in this case, the principle that an employer may terminate an employee for misconduct, even if that misconduct is allegedly related to the employee's disability, applies in these circumstances as well."); Bussey v. West, No. 95-2398, 1996 WL 293209, at *1-2 (4th Cir. June 4, 1996) (unpublished; decision without opinion, 86 F.3d 1149) ("[The plaintiff] has multiple sclerosis, which (in her case) makes her irritable. . . . [Her Rehabilitation Act] claim fails because she was not 'otherwise

-41-

qualified' for the position from which she was fired. . . .
Whether [the plaintiff's] inappropriate behavior resulted from her
illness is irrelevant.  It was not unreasonable for [the defendant]
to conclude that [the plaintiff's] snappishness made her unfit for
[her] position . . . ." (internal citation omitted)).[29]

In light of the foregoing Fourth Circuit authority, Defendant
acted lawfully when it terminated Plaintiff from medical school
based on its judgment that he failed to meet the professionalism
standards of its program, notwithstanding any evidence that the
behavior deemed unacceptable stemmed from Plaintiff's mental
impairments (and/or related medications).  In other words, because
Plaintiff behaved in a manner that did not meet the medical
school's requirements (regardless of the source of that behavior),
he cannot meet the "otherwise qualified" element of his claim <u>and</u>
Defendant's refusal to "accommodate" Plaintiff by granting him a
dispensation from its professionalism standards fails to qualify as
discrimination based on disability.  The Court therefore should
grant summary judgment to Defendant.  Any other conclusion would
upset the Supreme Court's carefully-struck "balance between the
statutory rights of the handicapped to be integrated into society

---

[29] The Supreme Court has signaled that it agrees with the position taken
by the Fourth Circuit on this issue.  See <u>Raytheon Co. v. Hernandez</u>, 540 U.S. 44,
54 n.6 (2003) ("To the extent that the court [below] suggested that, because
respondent's workplace misconduct is related to his disability, petitioner's
refusal to rehire respondent on account of that workplace misconduct violated the
ADA, we point out that we have rejected a similar argument in the context of the
Age Discrimination in Employment Act."  (citing <u>Hazen Paper Co. v. Biggins</u>, 507
U.S. 604, 611 (1993))).

and the legitimate interests of federal grantees in preserving the integrity of their programs," <u>Alexander</u>, 469 U.S. at 300.

Plaintiff, in fact, recognized the intuitive logic of this construction of the federal disability discrimination laws in his deposition:

> Q. . . . [W]ould [the medical school] always have to forgive unprofessional behavior?
>
> A. Now, that is an interesting question. I don't think so. Now, <u>I am not going to excuse anyone, including myself, from any standard of behavior. That just wouldn't make any sense.</u>

(Halpern Dep. at 150 (emphasis added).)

Nor may Plaintiff avoid summary judgment by labeling his proposal to remain in the medical school program while undergoing therapy a "reasonable accommodation." First, the above-cited case law from the Fourth Circuit recognizes (explicitly in some decisions and implicitly in the others) that an individual's insistence that an employer or program-provider must refrain from taking adverse action otherwise warranted by the individual's behavior does not constitute a "reasonable" request for accommodation. <u>See, e.g.</u>, <u>Darcangelo</u>, 189 Fed. Appx. at 219 (rejecting plaintiff's argument that district court should have denied summary judgment based on her evidence that defendant could have accommodated her behavioral excesses by re-assigning her to supervisor more sympathetic to her mental impairment); <u>Carrozza</u>, 1995 WL 8033, at *3 (rejecting as "unreasonable," plaintiff's

"proposed accommodation" of "exemption from normal performance reviews [because such an approach] would require [defendant] to change the very essence of [plaintiff's] position").

Second, the Fourth Circuit expressly has held that the disability discrimination laws "contain no reference to an individual's *future* ability to perform the essential functions of his position. To the contrary, they are formulated entirely in the present tense, framing the precise issue as whether an individual 'can' (not 'will be able to') perform the job with reasonable accommodation." Myers, 50 F.3d at 283 (emphasis in original). In this case, upon his termination from medical school, Plaintiff acknowledged that he had failed to behave as Defendant deemed necessary, but proposed that he remain in the program while he addressed his behavioral shortcomings by undertaking therapy and related activities on the prospect that he might in the *future* become able to meet the medical school's professionalism requirements. Plaintiff has identified no authority that recognizes such a proposal as a "reasonable accommodation."

Nor could any such authority exist in the Fourth Circuit, given that court's ruling that "[n]othing in the text of the reasonable accommodation provision requires [a defendant] to wait an indefinite period for an accommodation to achieve its intended effect. Rather, reasonable accommodation is by its terms most logically construed as that which presently, or in the immediate

-44-

future, enables the [plaintiff] to perform the essential functions of the [position] in question." Id. Plaintiff has failed to point to any record evidence that would establish that, at the time of his termination from the medical school "or in the immediate future," id., he would have the ability to meet the professionalism standards required by Defendant's program. Instead, Plaintiff's own deposition testimony and the statements of his physician again confirm the insufficiency of his claim in this regard. (Halpern Dep. at 150-51 (acknowledging that "reasonable accommodation, [for] which [he] was asking . . . stated that [he] was going through a process," but that "none of this is an instantaneous thing," that learning new behaviors requires time "to act them out until, finally, it is you know, ingrained," and "it is not going to be an overnight thing"); Reifler Aff. at Ex. BB (letter from Plaintiff's physician acknowledging that "task of making major behavioral changes will be a process that will continue in the future").

The record evidence, viewed in the light most favorable to Plaintiff, also leaves doubt about the nature of the outcome (at some indefinite date in the future) of the behavioral modification program that Plaintiff sought to undertake. As detailed above in the Facts section (see supra p. 20 & n.14), at the time of his administrative appeal, Plaintiff appeared to have accepted full responsibility for the fact that he had behaved unprofessionally during his time in the medical school program (see, e.g., Halpern

Dep. at Ex. 5, p. 1031-1032 (admitting "tendency to be overly defensive when . . . challenged; intolerant of others whose actions are not convenient to [him]; sarcastic and rude; and occasionally impulsively abrupt when [he is] under stress," as well as "tendency to be arrogant," and describing SPPC as having "held up a mirror for [him] to take a long painful look at [him]self, [whereupon he was] embarrassed to see [him]self as [the SPPC] d[id]")); however, by the time of his deposition, Plaintiff substantially discounted most of the negative assessments of his prior behavior (apart from his conduct during the very narrow window of time in the spring through early fall of 2006, when he suffered from what he termed a severe medication reaction) (see supra pp. 26-31).

It is very difficult to see how Plaintiff effectively could modify his behavior to become more professional, if he now believes that he generally had not behaved unprofessionally in the past. Further, and more significantly, to the extent Plaintiff continued to acknowledge any need for behavioral change at the time of his deposition, neither he nor his expert could offer any certainty about the prospect of success in that endeavor. (See Halpern Dep. at 152 (answering "I hope it is zero," in response to question as to "[h]ow many times would the school be required to give you one more chance"); Carr Dep. at 49-50 (responding "I don't know," when asked "what do you think would be the likely outcome of th[e] path [proposed by Plaintiff and Dr. Hughes]?").)

As a result, Defendant also is entitled to summary judgment on the ground that the requirement of "reasonable accommodation does not require [a defendant] to wait indefinitely for [a plaintiff's] medical conditions to be corrected, especially in light of the uncertainty of cure." Myers, 50 F.3d at 283. See also Adamcyzk v. Chief of Police of Baltimore County, No. 97-1240, 1998 WL 33694, at *1-2 (4th Cir. Jan. 30, 1998) (unpublished; decision without opinion, 134 F.3d 363) ("Adamczyk asserts that he is an alcoholic and that his misconduct was a product of that disability. . . . [He] contends that since . . . [they] knew he was an alcoholic, Defendants had a duty to accommodate him by permitting him to seek treatment before demoting him. We disagree.").[30]

_____

[30] In support of its argument that Plaintiff failed to present sufficient evidence on the "otherwise qualified" element, Defendant cites the doctrine of judicial deference to decision-making by academic institutions (adopted in the due process context by Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 225-28 & nn.11-13 (1985), and Board of Curators of Univ. of Mo. v. Horowitz, 435 U.S. 78, 88-91 & n.6 (1978), and applied in discrimination cases by other courts, see, e.g., Shin v. University of Md. Med. Sys. Corp., No. 09-1126, 2010 WL 850176, at *8 (4th Cir. Mar. 11, 2010) (unpublished); Zukle v. Regents of Univ. of Cal., 166 F.3d 1041, 1047-48 (9th Cir. 1999); Hankins v. Temple Univ., 829 F.2d 437, 443 (3d Cir. 1987); Doe v. New York Univ., 666 F.2d 761, 775-76 (2d Cir. 1981), superseded by rule in part on other grounds as recognized in Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 171 n.7 (2d Cir. 2001); Manickavasagar v. Virginia Commonw. Univ. Sch. of Med., 667 F. Supp. 2d 635, 642-43 (E.D. Va. 2009); Middlebrooks v. Univ. of Md. at College Park, 980 F. Supp. 824, 830 n.4 (D. Md. 1997), aff'd, No. 97-2473, 1999 WL 7860 (4th Cir. Jan. 11, 1999) (unpublished; decision without opinion, 166 F.3d 1209); cf. Krotkoff v. Goucher College, 585 F.2d 675, 681-82 (4th Cir. 1978) (recognizing that "cases in which courts have evinced reluctance to oversee the decisions of college administrators . . . generally have involved the application of the fourteenth amendment to state institutions or the interpretation of statutes prohibiting racial or sexual discrimination"); but see Jane v. Bowman Gray Sch. of Med. - N.C. Baptist Hosp., 211 F. Supp. 2d. 678, 695 n.27 (M.D.N.C. 2002) (questioning applicability of deference doctrine from Ewing and Horowitz in at least certain discrimination contexts)). (Docket Entry 28 at 14-15.) Because, given the discussion above, supra pp. 33-46, Defendant's entitlement to summary judgment appears clear, the Court sees no need to rely on said doctrine. The Court does observe, however, that (at least in the context of professional degree programs) case law contradicts Plaintiff's position that "[a] school is only given [deference] in
(continued...)

<u>Count II – Title II of the ADA</u>

"The [ADA] prohibits discrimination against persons with disabilities in three major areas of public life:  employment, under Title I, 42 U.S.C. §§ 12111-12117; public services, under Title II, 42 U.S.C. §§ 12131-12165; and public accommodations, under Title III, 42 U.S.C. §§ 12182-12189."  <u>A Helping Hand, LLC v. Baltimore County, Md.</u>, 515 F.3d 356, 361 (4th Cir. 2008). Plaintiff's Complaint made clear that "[t]his action is brought under <u>Title II</u> of the Americans with Disabilities Act, 42 U.S.C.S.

---

[30](...continued)
relation to . . . the coursework the student is expected to complete" and not to "professionalism" matters (Docket Entry 36 at 12-13).  <u>See</u> <u>Horowitz</u>, 435 U.S. at 91 n.6 ("Respondent contends . . she was not dismissed because of 'clinical incompetence,' an academic inquiry, but for disciplinary reasons . . . not[ing] that the school warned her that significant improvement was needed not only in the area of clinical performance but also in her personal hygiene and in keeping to her clinical schedules. . . .  Personal hygiene and timeliness may be as important factors in a school's determination of whether a student will make a good medical doctor as the student's ability to take a case history or diagnose an illness.");  <u>Ewing</u>, 474 U.S. at 227 n.13 (noting, in discussing deference as to dismissal of medical student, that "the University might well have concluded that [plaintiff's] sensitivity to difficulties in his personal life suggested an inability to handle the stress inherent in a career in medicine");  <u>Shin</u>, 2010 WL 850176, at *8 ("[W]e defer to the views of [a university medical system] on the standards for <u>professional</u> and academic achievement" (emphasis added));  <u>Hankins</u>, 829 F.2d at 443 (treating university hospital's decision to terminate plaintiff's fellowship because, inter alia, she "was excessively absent and late" and "demonstrated reluctance to respond to constructive criticism" as entitled to deference);  <u>Doe</u>, 666 F.2d 761, 775-76 (holding that, because courts have "limited ability . . . to determine . . . whether [an individual] would meet reasonable standards for academic <u>and professional</u> achievement established by a university or a non-legal profession . . ., considerable judicial deference must be paid to the evaluation made by the institution" (emphasis added));  <u>Herron v. Virginia Commonw. Univ.</u>, 366 F.3d 355, 359-60 (E.D. Va. 2004) (ruling that, where nurse anesthetist program terminated student due, inter alia, to "her poor attitude that included an air of combativeness when confronted with instruction," <u>Horowitz</u> standard applied), <u>aff'd</u>, 116 Fed. Appx. 467 (4th Cir. 2004); <u>Lewin v. Medical College of Hampton Rds.</u>, 910 F. Supp. 1161, 1166 (E.D. Va. 1996) (finding that <u>Horowitz</u> controlled where medical school determined that student "had not demonstrated an acceptable level of academic and clinical achievement, as well as a style and standard for <u>professional judgment and behavior</u> that is consistent with the responsibilities of the medical profession" (internal quotation marks omitted) (emphasis added)), <u>aff'd</u>, No. 96-2253, 1997 WL 741236 (4th Cir. Nov. 26, 1997) (unpublished; decision without opinion, 131 F.3d 135).

§ 12132, as well as § 504 of the Rehabilitation Act of 1973, 29 U.S.C.S. § 794(a)." (Docket Entry 1 at 2 (emphasis added).) For the reasons set forth in the preceding subsection, Defendant should receive summary judgment as to Plaintiff's Rehabilitation Act claim (set out in "Count I" of the Complaint). "Count II," with the heading "<u>Title II</u> of the Americans with Disabilities Act, 42 U.S.C.S. § 12132," incorporates the same factual allegations on which Plaintiff predicated Count I and alleges that, based on those facts, Defendant "discriminated against Plaintiff solely on the basis of Plaintiff's disabilities in violation of 42 U.S.C. §12101, and the Federal regulations promulgated pursuant to the Act at 28 C.F.R. Part 35 et seq." (Docket Entry 1 at 6 (emphasis added).)

In its summary judgment motion, Defendant correctly argued that the protections of Title II of the ADA apply only to the activities of a "public entity," 42 U.S.C. § 12132, defined as "any department, agency, special purpose district, or other instrumentality of a State or States or local government," 42 U.S.C. § 12131(1)(B). (Docket Entry 28 at 20.) Defendant further asserts, by reference to record evidence, that it "is not a covered public entity." (<u>Id.</u> (citing Applegate Aff. at ¶ 5).) In his response, Plaintiff acknowledges that he cannot prevail under Title II, but seeks to avoid summary judgment as to Count II of his Complaint by making two arguments. (Docket Entry 36 at 19.)

First, Plaintiff notes that he filed a motion seeking to amend his Complaint in a manner, inter alia, that "substitut[ed] 'Title III' of the ADA for 'Title II,'" because "Title III of the ADA applies to private entities, like [Defendant], that operate public accommodations." (Id. (citing 42 U.S.C. § 12181(7)(J)).) The Court (per the undersigned United States Magistrate Judge), however, denied that motion for lack of good cause (as required by Federal Rule of Civil Procedure 16(b), given the timing of the motion). (Docket Entry 53.)[31] Second, and alternatively, Plaintiff argues that the Court should ignore his express invocation of Title II, as well as the absence of any reference in the Complaint to Title III, and should treat Count II as if it alleged a claim under Title III of the ADA. (Docket Entry 36 at 19 (citing Strickland v. Jewell, 562 F. Supp. 2d 666, 670 (M.D.N.C. 2007), for proposition that "the label placed on a claim in the pleadings is not decisive; instead, the nature of the issues raised is controlling").)

The Court need not decide if Count II of Plaintiff's Complaint should be construed as presenting a claim under Title III of the ADA because, assuming that it did, said claim would be subject to summary judgment for the same reasons as was the Rehabilitation Act claim set out in Count I. See Ellis v. Morehouse Sch. of Med., 925 F. Supp. 1529, 1550-51 (N.D. Ga. 1996) ("[The plaintiff] seeks to modify his original Complaint by dropping his claim under Title II

_____

[31] Plaintiff has objected to that ruling. (Docket Entry 56.)

of the [ADA] and replacing it with a claim under Title III of the [ADA] . . . because Title II only applies to public entities, while [Defendant] is a private entity . . . [to whom Title III would apply], as its ambit extends to public accommodations, which include institutions of higher learning. . . . The elements for sustaining a claim under Title III of the [ADA] are substantially similar to those required to sustain a claim under the Rehabilitation Act. The Court already has granted [Defendant's] Motion for Summary Judgment on [the plaintiff's] Rehabilitation Act claim. For the reasons discussed in that portion of the Court's Order, the Court finds that any claim [the plaintiff] may state under the [ADA] also would be without merit.").

"A person alleging discrimination under Title III must show (1) that he is disabled within the meaning of the ADA, (2) that the defendant is a private entity that owns, leases, or operates a place of public accommodation, (3) that the defendant took adverse action against the plaintiff that was based upon the plaintiff's disability, and (4) that the defendant failed to make reasonable modifications that would accommodate the plaintiff's disability without fundamentally altering the nature of the public accommodation." Amir v. St. Louis Univ., 184 F.3d 1017, 1027 (8th Cir. 1999) (emphasis added). For the reasons stated in the prior subsection (see supra pp. 33-46) and viewing the record evidence in

the light most favorable to Plaintiff, the Court determines as a matter of law that:

1) Defendant "took adverse action," <u>Amir</u>, 184 F.3d at 1027, against Plaintiff based upon its judgment that he failed to behave in a manner that met its standards of professionalism, not "based upon [his] disability," <u>id.</u>;

2) under Fourth Circuit authority, the fact that the conduct cited by Defendant as grounds for Plaintiff's termination may have stemmed from Plaintiff's disabilities has no bearing on the lawfulness (under the disability discrimination laws) of Defendant's action;

3) Plaintiff's request for dispensation from Defendant's professionalism standards would not constitute a "reasonable modification," <u>id.</u>, of Defendant's medical school program, but instead would have the effect of "fundamentally altering the nature of [that program]," <u>id.</u>; and

4) Plaintiff's request to remain in the medical school program while undergoing therapy and related activities designed to address the behaviors deemed unacceptable by Defendant does not constitute a reasonable accommodation because of the uncertainty of the duration and the prospects for success of such behavior modification efforts.

Accordingly, summary judgment should be entered against Plaintiff on Count II of his Complaint as well.[32]

CONCLUSION

For all of the foregoing reasons, the record evidence (viewed in the light most favorable to Plaintiff) "show[s] that there is no genuine issue as to any material fact and that [Defendant] is entitled to a judgment as a matter of law.'" Emmett, 532 F.3d at 297 (quoting Fed. R. Civ. P. 56(c)).

**IT IS THEREFORE RECOMMENDED** that Defendant's Motion for Summary Judgment (Docket Entry 19) be **GRANTED**.

                                          /s/ L. Patrick Auld
                                     **L. Patrick Auld**
                              **United States Magistrate Judge**
July 30, 2010

---

[32] The Court further notes that Plaintiff could not maintain any claim for damages under Title III of the ADA: "it is well established that Title III of the ADA proscribing discrimination in public accommodations does not provide for a private cause of action for damages." Gregory v. Otac, Inc., 247 F. Supp. 2d 764, 770 (D. Md. 2003). Accord Goodwin v. C.N.J., Inc., 436 F.3d 44, 50 (1st Cir. 2006) (adopting uniform position of United States Courts of Appeals for the Second, Third, Sixth, Eleventh, and District of Columbia Circuits).